IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYLINE ADVANCED TECHNOLOGY SERVICES,<br><br>          Plaintiff,<br><br>     v.<br><br>SABRINA SHAFER,<br><br>          Defendant. | Case No. 18-cv-06641-CRB<br><br>**ORDER GRANTING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT, SETTING STATUS** |

Plaintiff Skyline Advanced Technology Services parted ways with Defendant Sabrina Shafer, its former Director of Training and Services Sales, and then brought suit against her, accusing her of a wide variety of misconduct. Shafer spoliated evidence, resulting in severe sanctions. Skyline now moves for partial summary judgment on its claims of breach of contract and breach of the duty of loyalty. See Mot. (dkt. 84); Reply (dkt. 95). Shafer argues that numerous factual disputes preclude summary judgment, and challenges Skyline's damages expert. See Opp'n (dkt. 92). As discussed below, the Court GRANTS the motion as to the breach of contract and breach of the duty of loyalty claims, and will postpone the award of damages.

**I.     BACKGROUND**

   **A.     Factual Background**

      **1.     Parties and Terms of Employment**

Skyline is a "leading provider of training, professional services, and hardware sales." Zanotto Decl. (dkt. 84-2) ¶ 2. One of its biggest customers is Cisco Systems. Id. Skyline is a "Cisco Certified Gold Partner," which allows it to more easily do deals with Cisco, including deals

with other companies that want to provide services to Cisco. Id. ¶ 3. Xentaurs is another company[1] that sometimes entered into contracts with Skyline to provide services to Cisco. Id. In February 2016, Skyline hired Shafer as its Director of Training and Services Sales. Lipanovich Decl. (dkt. 84-1) Ex. 1 (offer letter). Shafer was responsible for training and services sales on the West Coast, and, as an attorney, was also responsible for providing 120 hours a year of legal counsel to Skyline. Id.

Skyline contends that, as part of her hiring process, Shafer signed an Employee Proprietary Information and Inventions Agreement. Lipanovich Decl. (dkt. 84-1) Ex. 2 (signed agreement). Skyline attaches to its motion such an agreement, which has the initials "SMS" and the date "3/1/16" handwritten in each bottom right corner, and the signature "Sabrina Shafer" on the last page. Id. Skyline also submitted, in connection with its reply brief, a copy of an email from Shafer to Marla Wall, Skyline's HR Administrator, attaching the signed agreement. Wall Decl. (dkt. 95-2) ¶ 2, 6, Ex. 1 (3/2/16 email from Shafer to Wall).

The agreement states that the employee "will not, without the Company's express written consent, engage in any employment or business activity which is competitive with, or would otherwise conflict with, [her] employment at the Company." Lipanovich Decl. Ex. 2 (signed agreement) ¶ 4. It further states that the employee "[has] not entered into, and . . . will not enter into, any agreement either written or oral in conflict herewith." Id. ¶ 5. And it provides that the employee "will hold in strictest confidence and will not disclose" any of the Company's Proprietary Information, which it defines expansively to include "all confidential and/or proprietary knowledge, data or information of the Company," including (among many other things) "marketing and selling, business plan, budgets and unpublished financial statements, licenses, prices and costs . . . information regarding the skills and compensation of other employees of the Company." Id. ¶¶ 1.1, 1.2.

Shafer initially claimed that she never signed this agreement. She testified in her

---

[1] Skyline characterizes Xentaurs as a competitor. Id. Shafer disputes that Xentaurs is a competitor. Lipanovich Supp. Decl. Ex. 16 (Shafer depo.) at 197:13–14, 285:4–9. She states that Xentaurs and Skyline "both supported Cisco." Id. at 291:3–8.

deposition, with the signed agreement in front of her, that she did not recall signing it, did not think she wrote the initials, and that the signature "doesn't look like my writing." Odim Decl. (dkt. 92-1) Ex. 4 (Shafer Depo.) at 196:4–15. She testified that "Skyline didn't have a policy," id. at 196:16–17, and that she did not sign that document, id. at 197:8–9. In a declaration submitted along with her opposition, Shafer declared:

> I did not sign the Skyline Advanced Technology Services Employee Proprietary Information and Inventions Agreement. . . . I did not initial any of the pages of Skyline Exhibit 2. No one at Skyline ever showed me or gave me Exhibit 2. I saw it for the first time in this litigation.

Shafer Decl. (dkt. 92-2) ¶ 4. At the motion hearing, however, Shafer changed her position. In response to inquiries by the Court, Shafer stated that while she did not recall signing the agreement, she was no longer asserting that she did not sign it.

Skyline paid Shafer a six-figure salary augmented by commissions. Lipanovich Decl. Ex. 3 (Kawamoto Report) at 7–8, Ex. A (spreadsheet re "Summary of Compensation Paid" between 7/1/16 and 10/8/18).

Skyline fired Shafer on September 18, 2018. Shafer Decl. ¶ 14; Lipanovich Supp. Decl. Ex. 16 (Shafer depo.) at 206:5–8.

### 2. Dispute Between the Parties

#### a. Sharing Internal Information

At some point during Shafer's employment, Skyline learned that Shafer had exchanged "internal company information" with both Xentaurs and individuals at Cisco. Mot. at 2. Skyline points to four emails. The first is from Shafer to Juan Guevara, the President of Xentaurs, in which Shafer disclosed details of Skyline's bid. Lipanovich Decl. Ex. 4 (9/10/18 email from Shafer to Gurvara). The second is from Shafer to Rich Wonders at Cisco, seeking his input on a draft email to a Skyline employee. Lipanovich Decl. Ex. 5 (2/19/2017 email from Shafer to Wonders). The third is from Wonders to Shafer, responding to an email Shafer forwarded to him from another employee at Skyline, discussing strategy about yet another Skyline employee's performance. Lipanovich Decl. Ex. 6 (1/3/18 email from Wonders to Shafer). The fourth is from Joe Onisick at Cisco to Shafer, attaching a contract with Cisco and asking her to "[p]lease take a

3

look" and "keep it between us for now." Lipanovich Decl. Ex. 7 (5/3/18 email from Onisick to Shafer). Skyline contends that Shafer had "undisclosed romantic relationships" with both Wonders and Onisick. See Mot. at 2.[2]

Shafer does not agree that she shared any confidential information. See Opp'n at 12; Shafer Decl. ¶ 16 ("I did not disclose any confidential or proprietary information of Skyline.").

### b.   Independent Contractor Agreement with Xentaurs

During Shafer's employment with Skyline, both she and Onisick entered into undisclosed agreements with Xentaurs.[3] Onisick signed an Independent Sales Agent Agreement with Xentaurs on May 1, 2018. Lipanovich Decl. Ex. 8 (5/1/18 Onisick agreement).[4] And Shafer signed an "Independent Contractor Agreement" with Xentaurs on August 23, 2018. Lipanovich Decl. Ex. 9 (8/23/18 Shafer agreement).[5] That agreement provided, among other things, that Shafer would begin work for Xentaurs on September 1, 2018, and be paid $175 per hour. Id. at 5 ("Contractor Summary").

---

[2] These relationships are supposedly relevant because they help Skyline define the periods of time when they contend that Shafer was disloyal to Skyline. See Kawamoto Report at 2–4 ("Shafer did not disclose her relationship with Wonders to Skyline. During their relationship, Shafer shared internal Skyline communications" . . . "Shafer also disclosed internal and/or confidential information to Onisick during her employment with Skyline and worked with Onisick for the benefit of themselves and others. This overlapped with the time period when Shafer and Onisick were in an undisclosed romantic relationship."). Skyline includes an email from Wonders to Shafer about an upcoming trip that includes language like "I wish I was there with you" and "Please be careful honey!!" and "I love you very much, and pray for you always!" Lipanovich Decl. Ex. 15 (2/26/18 email from Wonders to Shafer). See also Lipanovich Supp. Decl. Ex. 16 (Shafer depo.) at 294: 9–13 (Shafer answering "I don't understand" to question of whether she had a romantic relationship with Wonders); id. at 325:19–21 (Shafer answering "I don't understand the question" of whether she had a romantic relationship with Onisick); see also id. at 325:22–326:20 (Shafer agreeing that she had spent the night at Onisick's house "a handful" of times but maintaining that she was networking).

[3] Skyline characterizes Shafer's agreement as an "undisclosed consulting agreement." Mot. at 7, 9. Skyline does not cite to any evidence that the agreement was undisclosed, but Shafer does not dispute that assertion. In her deposition, Shafer testified that she did not recall ever disclosing to Skyline that she entered into an independent contractor agreement with Xentaurs while still a Skyline employee (and did not acknowledge having entered into such an agreement at all). Lipanovich Supp. Decl. Ex. 16 (Shafer depo.) at 333:15–19.

[4] Shafer argues that Exhibits 8, 10, and 12 should be stricken as hearsay. Opp'n at 8. "At the summary judgment stage, we do not focus on the admissibility of the evidence's form." See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

[5] The Motion states: "Shafer began negotiating her own deal with Xentaurs in July 2018," but cites to no support for that statement. See Mot. at 3. Shafer's own declaration states that she "began looking for new employment" in mid-2018 and that "[o]n July 26, 2018, after being asked," she told Guevera "that she was considering leaving Skyline for new opportunities." Shafer Decl. ¶ 11.

Shafer was not forthcoming about her agreement with Xentaurs during her deposition. She testified repeatedly that she did not understand the question of whether she entered into any agreements with any other company, or Xentaurs specifically, while employed by Skyline. See Lipanovich Supp. Decl. Ex. 16 (Shafer depo.) at 202:13–204:9; see also id. at 332:5–333:14 (answering "I don't recall" to question of whether she entered into independent contractor agreement with Xentaurs). In her declaration, Shafer acknowledges the independent contractor agreement but states that "[p]rior to [her] termination, [she] did not work for Xentaurs." Shafer Decl. ¶ 14. She explains:

> I did not become an employee for Xentaurs until October 1, 2018. I signed a consulting agreement with Xentaurs on August 23, 2018, prior to my termination from Skyline. Guevera and I agreed that the agreement was not meant to be acted upon by me or Xentaurs, The agreement was intended to be a placeholder so Xentaurs and I could explore an employment relationship.

Id. Guevara also testified that he understood that Shafer would leave Skyline before she started providing any services to Xentaurs. Odim Decl. Ex. 1 (Guevara depo.) at 233:15–20. Prior to Shafer's termination from Skyline, Xentaurs paid her "no salary, wages, commissions, fees, or other money." Shafer Decl. ¶ 15.

### c. Zero-Markup Deals

During Shafer's tenure at Skyline, Skyline entered into two contracts involving Xentaurs and Cisco. Zanotto Decl. ¶ 3. Shafer negotiated the deals on behalf of Skyline. Id. Skyline contends that "while Skyline, Xentaurs, and Cisco were negotiating the Statements of Work" on the contracts, Onisick and Shafer were already working for Xentaurs and against Skyline. Mot. at 3. Skyline asserts that Shafer and Onisick structured the two deals "for their personal benefit and for the benefit of their future employer, Xentaurs." Mot. at 3.

Details of these deals are somewhat scarce, including the dates when various deal-related events occurred (particularly in relation to Shafer's independent contractor agreement with Xentaurs[6]). Skyline relies in part on the expert declaration of Kawamoto, see Mot. at 3 (citing

---

[6] The Motion states: "The negotiations began in May 2018" but cites to no support for that statement. See Mot. at 3.

5

Kawamoto Report at 5–7 for details of deals), which is problematic as Kawamoto is a forensic accountant whose expertise does not involve the Skyline-Xentaurs-Cisco deals. In any case, it is undisputed that in both deals, Shafer negotiated for Skyline to receive no money from Cisco for its "pass through" role between Cisco and Xentaurs. Zanotto Decl. ¶ 4 ("Shafer negotiated for Skyline to have no mark up—and thus receive nothing—for the pass through work such that Xentaurs would receive the entire sum."). "A typical mark up on pass through contracts such as the Statements of Work with Xentaurs and Cisco is at least 10%." Id. Guevara testified that he found out later that there had been no markup for Skyline; he said that he "never learned why" and that it was "not typical." Lipanovich Decl. Ex. 11 (Guevara Depo.) at 143:20–144:7.

Importantly, while Shafer agrees that Skyline "received no percentage of the payments Xentaurs expected from Cisco," see Opp'n at 4–5, Shafer blames Skyline CEO Mike Zanotto. She asserts that "Zanotto initiated the idea" of doing the Skyline-Xentaurs-Cisco deals "[w]ith full knowledge that the revenue of the subcontracted work . . . would go to Xentaurs." Shafer Decl. ¶ 8. She asserts that "Zanotto told [her] that giving up revenue now . . . was part of business and 'bait to catch bigger fish.'" Id. She argues that it was "[p]er the instructions of Zanotto" that "Skyline received no percentage of the payments Xentaurs expected from Cisco." Opp'n at 4 (citing Shafer Decl. ¶¶ 6–8). Shafer also asserts that after she told Xentaurs "about the pricing per Zanotto's instructions and Gurvera accepted," it was "other Skyline employees" who "handled the negotiation," finalized the terms, and signed the agreements. Shafer Decl. ¶ 10. She asserts: "I did not have the authority to approve and did not approve [the two deals] on behalf of Skyline." Id. She adds that Roger G. Robert, Skyline's Senior Director of Services and her superior, approved all Skyline contracts. Id.

### d. Poaching Employees

Toward the end of Shafer's tenure at Skyline, she introduced Xentaurs to current Skyline employees so that he could consider hiring them. See Odim Decl. Ex. 1 (Guevara depo.) at 233:22–235:24 (Shafer introduced him to two employees she might bring over from Skyline to join Xentaurs). On August 23, 2018, Shafer emailed Guevara and Skyline employee Greg Daugherty to "introduce them," saying that Daugherty had been "instrumental to the sales growth

6

and leadership on my team." Lipanovich Decl. Ex. 13 (8/23/18 email from Shafer to Guevara, Daugherty). She gave Daugherty's background in flattering terms and talked up the "top talent, vision, execution, and team growth culture Xentaurs has." Id. On September 10, 2018, she emailed Guevara, saying, among other things, "Edwin knows the content. He's also geared up to teach the SD-WAN Wednesday. . . . I have 2 other contractors that know the topic very well and I've worked with/vetted if we need to pull in some outside EN resources." Lipanovich Decl. Ex. 4 (9/10/18 email from Shafer to Guevara).

Shafer argues that "[w]hen Shafer's co-workers, Edwin Owen and Greg Daugherty, learned that Shafer was looking for new employment, they approached Shafer." Opp'n at 6. Shafer asserts that Owen and Daugherty "were fed-up with Skyline, but could not leave until they had a replacement job." Id.; Shafer Decl. ¶ 12. She concedes: "After they asked, I referred them to Xentaurs." Shafer Decl. ¶ 12.

### e. Reviewing Xentaurs-Cisco Deal

Shafer notes that on August 27, 2018, Onisick—who had left Cisco to work for Xentaurs—sent her an email attaching a draft Statement of Work for a Xentaurs-Cisco deal, with the message "Another one for you to take a look through." Opp'n at 6 (citing Odim Decl. Ex. 3A (Onisick depo.) at 72:21–73:15 (Onisick testifying that he does not recall if he sent this email to Shafer), Ex. 7 (8/27/18 email from Onisick to Shafer forwarding email from Onisick to Guevara re a Xentaurs bid, attached Statement of Work).[7] Shafer states in her declaration that she "looked at the draft SOW with an eye for opportunities to write Skyline into the deal, by changing its terms or making it a bigger deal, before it was pitched to Cisco." Shafer Decl. ¶ 13.

### B. Procedural History

Skyline brought suit against Shafer on October 31, 2018. See Compl. (dkt. 1). The Complaint includes claims for (1) breach of contract, (2) breach of fiduciary duty, (3) breach of the duty of loyalty, (4) fraudulent concealment, (5) fraudulent misrepresentation, (6) negligent

---

[7] This email is very similar to the May 3, 2018 email from Onisick to Shafer attaching a "2019 May Cisco INSBU" and stating "Please take a look at this and let me know if you see anything I need to change. of course keep it between us for now. Joe" See Lipanovich Decl. Ex. 7.

misrepresentation, and (7) conversion. Id. Shafer then filed suit against Skyline, and both cases were consolidated before this Court. Mot at 4.

Upon learning that Shafer had spoliated evidence, Skyline sought sanctions in both cases. See Motion for Sanctions (dkt. 48). In a 24-page Report and Recommendation, Magistrate Judge Robert Illman found that Shafer had willfully and intentionally destroyed evidence. See R&R (dkt. 62). Judge Illman detailed Shafer's conduct, which included delaying the return of two Skyline laptops for over a month and then returning them with all of the data wiped, id. at 6, forwarding favorable email to her personal email address and deleting and destroying all other evidence, id., being "less than cooperative" in her deposition, and claiming to know nothing about her suspicious document productions, id. at 7. Judge Illman found that "because of Shafer's destruction of documentary and electronic evidence, combined with her supposed inability to recall information or understand simple questions during her deposition, Skyline has been forced to rely to a great extent on third-party discovery to prepare its case-in-chief in the Skyline case and to prepare its defense in the Shafer case." Id. at 8. Judge Illman observed that Onisick had testified that "every single communication with Ms. Shafer has been destroyed" and, like Shafer, that he did not know, recall, or understand many questions. Id. Judge Illman noted that

> a number of factors such as Shafer's status as a licensed attorney, combined with her unconscionable and uncooperative behavior at her deposition (seemingly doing everything in her power to frustrate Skyline's effort to conduct its examination, such as repeatedly feigning an inability to understand even the most simply phrased questions), the less-than-plausible explanations in her affidavit, and the overt and glaring inconsistencies between her deposition testimony and the statements in her sworn affidavit, lead the undersigned to find that Shafer's testimony is filled with half-truths and outright fabrications.

Id. at 17. Judge Illman found that "both Shafer and Onisick deleted their text message and email communications with one another specifically to frustrate Skyline's efforts to conduct discovery and as part of a concerted effort to cover their evidentiary tracks." Id. at 18. Judge Illman further found that Shafer's claims about the laptops was not credible. Id. at 18–19. Judge Illman concluded that "the prejudice suffered by Skyline as a result of Shafer's willful destruction of evidence by replacing the hard drive on Skyline's laptop and by deleting all of the relevant but

8

unfavorable emails and text messages in her possession was seriously [exacerbated] by what appears to be the concerted effort by Shafer and Onisick to stonewall Skyline's efforts to gather relevant facts and evidence through their depositions." Id. at 20.  Judge Illman therefore recommended a terminating sanction for Shafer's case, and an adverse instruction (that the lost information was unfavorable to the party that lost it) for Skyline's case.  Id. at 21–24.  This Court adopted the Report and Recommendation.  See Order on R&R (dkt. 67).

In the related Shafer v. Skyline case, Shafer moved to set aside the judgment, "arguing that Skyline was not forthcoming in its Motion for Sanctions with regard to its ability to back up the data on Shafer's Skyline-issued laptop."  See Order Denying Motion to Set Aside Judgment (dkt. 128 in Case No. 19-cv-787-CRB) at 1.  This Court rejected Shafer's arguments, explaining:

> Even if the Court were to assume that Skyline could have restored or replaced the information on Shafer's Skyline laptop—which is wholly inconsistent with Skyline's actions, such as providing a hard drive for Shafer to back up the information on her computer and requesting that she preserve all evidence on her computer in anticipation of litigation—Shafer still willfully deceived the Court and willfully spoliated evidence—from her laptop and other sources. . . . Shafer, a lawyer, not only wiped the laptop of data after Skyline asked her to preserve all evidence, but also deleted all of her text message and email communications with Onisick and Xentaurs, offered conflicting testimony regarding the fate of the Skyline laptop and hard drive, and stonewalled Skyline in her deposition. . . . These actions are sufficient under the circumstances to support a dismissal of the case.

Id. at 12.[8]

Skyline then filed the pending motion for partial summary judgment, solely as to the breach of contract and breach of the duty of loyalty claims.  See generally Mot.  Shafer opposes the motion and challenges Skyline's damages expert, Kawamoto.  See Opp'n.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment

---

[8] Shafer initially appealed that decision, and then voluntarily dismissed her appeal.  See USCA Mandate (dkt. 131 in Case No. 19-cv-787-CRB).

as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Id. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**B.     Daubert**

Expert testimony is admissible if it is relevant and reliable. Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 589 (1993). Rule 702 of the Federal Rules of Evidence provides that experts may give opinions based on "scientific, technical, or other specialized knowledge" if such testimony would "help the trier of fact to understand the evidence or to determine a fact in issue." The testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and "the expert [must have] reliably applied the principles and methods to the facts of the case." F.R.E. 702. Trial courts are to act as gatekeepers, making certain "that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 152 (1999). A trial court's gatekeeping function applies not only to scientific testimony but to all

expert testimony. Id. at 147. The admissibility of expert opinion is a flexible inquiry: "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that he law grants the trial judge broad latitude to determine." Id. at 153. The general rule is that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) (citing Daubert, 509 U.S. at 596). "The test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Id. (quoting Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1318 (9th Cir. 1995)).

### III. DISCUSSION

This order will discuss Skyline's breach of contract claim, its breach of the duty of loyalty claim, and the issue of damages.

#### A. Breach of Contract Claim

To establish breach of contract in California, Skyline must demonstrate (1) the existence of a contract, (2) performance by Skyline or excuse for nonperformance, (3) breach by Shafer, and (4) damages. See First Commercial Mortg. Co. v. Reece, 89 Cal. App. 4th 731, 745 (2001).

##### 1. Last Three Elements

Skyline meets the last three elements of the claim here. Skyline performed its end of the contract by paying Shafer. Lipanovich Decl. Ex. 3 (Kawamoto Report) Ex. A ("Summary of Compensation Paid"). And Skyline was damaged by compensating an employee who was undermining it.

Shafer also breached the contract. Her most egregious breach was that she entered into a signed Independent Contractor Agreement with Xentaurs while still working for Skyline. See Lipanovich Decl. Ex. 2 (signed agreement) ¶ 5 (employee "will not enter into, any agreement either written or oral in conflict herewith"); see also Shafer Decl. ¶ 14 ("I signed a consulting agreement with Xentaurs on August 23, 2018, prior to my termination from Skyline."). That agreement does not say anything about how it "was not meant to be acted upon by [Shafer] or Xentaurs." See Shafer Decl. ¶ 4. Though Shafer argues that the Court should reject Skyline's invitation to conclude that "the mere existence of the Independent Contractor Agreement between Shafer and Xentaurs demonstrates that Shafer breached [her contract]," see Opp'n at 12, the Court

11

concludes just that. What the contract forbids is entering into an agreement in conflict with her Skyline contract—not performing work[9] or being compensated. See Lipanovich Decl. Ex. 2 (signed agreement) ¶ 5. Shafer breached her contract when she entered into the agreement with Xentaurs on August 23, 2018.

Shafer also breached her contract by disclosing Skyline's bid information to Guevara, Lipanovich Decl. Ex. 4 (9/10/18 email from Shafer to Guevara), by disclosing her view of a Skyline employee to Wonders, Lipanovich Decl. Ex. 5 (2/19/2017 email from Shafer to Wonders), and by disclosing her view of another Skyline employee to Wonders, Lipanovich Decl. Ex. 6 (1/3/18 email from Wonders to Shafer). Shafer baldly asserts that she "did not disclose any confidential or proprietary information of Skyline." Shafer Decl. ¶ 16. And she complains that "Skyline has failed to produce evidence to support its claim that the content of any of The Emails contains confidential or proprietary information," see Opp'n at 12, arguing that her interpretations of the emails should control, see id. at 11 (citing Shafer Decl. ¶¶ 4–20); Shafer Decl. ¶ 18 ("While I was employed at Skyline, I did not send Richard Wonders, Joseph Onisick, or any other person an email disclosing any Skyline confidential or proprietary information unless it was necessary and a required action as part of my employment duties to Skyline.").

But again, the language of the contract is plain. It requires employees to "hold in strictest confidence and . . . not disclose" any of the Company's Proprietary Information, and it defines that term to include "budgets and unpublished financial statements, . . . prices and costs" as well as "information regarding the skills and compensation of other employees of the Company." Lipanovich Decl. Ex. 2 (signed agreement) ¶¶ 1.1, 1.2. Shafer points to no exception for proprietary information that "was necessary and a required action as part of [her] employment duties to Skyline." See Shafer Decl. ¶ 18. Nor does she explain how these disclosures would even

---

[9] Skyline argues that Shafer "negotiated Statements of Work while having an undisclosed conflict of interest, in a deal for which her partner, Mr. Onisick, received thousands of dollars in commissions and for which Skyline received nothing." Reply at 6–7. But Skyline has not established the chronology of Shafer's negotiating/entering into her Independent Contractor Agreement and the two deals. In addition, Shafer states that Skyline receiving zero commission on the deals was Zanotto's (her boss's) idea, and that she did not have final sign-off on the deals. See Shafer Decl. ¶¶ 8–10. The Court cannot now conclude that the zero-commission deals evidenced a breach of Shafer's contract.

12

United States District Court
Northern District of California

fit that description.[10]

### 2. Existence of a Contract

The only question was whether Skyline had demonstrated the first element of a breach of contract claim, the existence of a contract, given Shafer's insistence that she did not sign the Employee Proprietary Information and Inventions Agreement. See Lipanovich Decl Ex. 2 (signed agreement); Odim Decl. Ex. 4 (Shafer Depo.) at 196:4–15, 197:8–9; Shafer Decl. ¶ 4. Now that Shafer has changed her position, from not having signed the agreement to not <u>remembering</u> whether she signed the agreement, this question is answered. Shafer's professed lack of memory does not create a genuine dispute of fact. Skyline's submission of the documents itself, see Wall Decl. ¶ 2, 6, Ex. 1 (3/2/16 email from Shafer to Wall), controls. See Manning v. Uber Techs., Inc., 358 F. Supp. 3d 962, (N.D. Cal. 2019) (noting that, in cases where "the defendant produced an arbitration agreement signed by the plaintiff[,] the courts held that the plaintiff's testimony that he or she did not recall signing the agreement was not sufficient to create a dispute warranting discovery."); see also Sundquish v. Ubiquity, Inc., No. 16-cv-2472-H-DHB, 2017 WL 3721475, *2, *4 (S.D. Cal. Jan. 17, 2017) (plaintiff asserted that he did not recall signing the arbitration agreement and that the first time he saw the arbitration provision was in connection with litigation, but did not dispute having signed the larger document that contained arbitration agreement). There is no genuine dispute of a material fact as to whether there was a contract in place.

Accordingly, the Court GRANTS the motion as to the breach of contract claim.

### B. Breach of the Duty of Loyalty Claim

To establish a breach of the duty of loyalty in California, Skyline must demonstrate "(1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that

---

[10] Shafer argues that Skyline cannot cure its failure to establish a breach of contract with an adverse inference. See Opp'n at 14–15. The Court need not reach this question, because the Independent Contractor Agreement breached Shafer's contract. But Shafer's argument that "When there is no corroborating evidence to support the fact under inquiry, no negative inference is permitted," see id. at 14 (citing Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000), is unpersuasive where Skyline has submitted some corroborating evidence of Shafer's breaches. Moreover, the Glanzer case is about a party choosing not to testify, not spoliating evidence. Here the Court has already ruled that there is an adverse inference from Shafer's spoliation. R&R at 21–24. The Court can infer that some of the evidence Shafer destroyed would have supported the breach of contract claim.

13

1  duty; and (3) damage proximately caused by that breach." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410 (2007). In California, all employees owe a duty of loyalty to their employers. E.D.C. Techs., Inc. v. Seidel, 216 F. Supp. 3d 1012, 1016 (N.D. Cal. 2016). Shafer concedes this point. See Opp'n at 15 ("Shafer does not dispute that she owed a duty of loyalty to Skyline."). The only elements at issue, therefore, are whether Shafer breached the duty, and whether Skyline was damaged. Skyline meets both elements.

### 1. Breach

The duty of loyalty to an employer is breached "when the employee takes action which is inimical to the best interests of the employer." Huong Que, 150 Cal. App. 4th at 414. "California law does not authorize an employee to transfer his loyalty to a competitor." Id. Skyline argues that Shafer breached the duty of loyalty that she owed Skyline by "working with Onisick to negotiate deals that were favorable to Skyline's competitor (Xentaurs) and unfavorable to Skyline, performing work (including giving legal advice) for Xentaurs, entering into an undisclosed consulting agreement with Xentaurs, sharing confidential Skyline information with Xentaurs, and attempting to recruit Skyline employees to join Xentaurs." Mot. at 9. Shafer responds that this claim "suffer[s] from the same infirmities as does the breach of contract claim." Opp'n at 15.

There is a dispute of fact about the two Skyline-Xentaurs-Cisco deals and whose idea it was for Skyline to receive no commissions. There is also a dispute of fact about for whose benefit Shafer reviewed the Xentaurs bids. But Skyline's other examples hold up.

Shafer's entering into the Independent Contractor Agreement with Xentaurs while she still worked for Skyline breached her duty of loyalty to Skyline. "[A] person cannot serve two masters simultaneously," and therefore "an employer's right to undivided loyalty is compromised when an employee's outside activities give rise to a possibility of personal influences." Stokes v. Dole Nut Co., 41 Cal. App. 4th 285, 296 (1995) (internal quotation marks omitted). When Shafer signed an agreement to work for Xentaurs while still working for Skyline and negotiating a deal on Skyline's behalf with Xentaurs and Cisco, Shafer's activities gave rise to a possibility of personal influences. Shafer's email to Guevara in which Shafer disclosed details of Skyline's bid also evidences a breach of Shafer's duty to Skyline, and her apparent loyalty to Xentaurs. See

14

Lipanovich Decl. Ex. 4 (9/10/18 email from Shafer to Gurvara).

Poaching Skyline employees for Xentaurs also breached Shafer's duty of loyalty to Skyline. Shafer admits that she recruited Skyline employees to join Xentaurs while she still worked for Skyline. See Shafer Decl. ¶ 12 ("After they asked, I referred them to Xentaurs."). It is irrelevant that the Skyline employees initiated the conversation with Shafer or that she also referred them to other employers. See id. Recruiting current employees to leave a company while still employed by that company is a breach. See Am. Republic Ins. Co. v. Union Fidelity Life Ins. Co., 470 F.2d 820, 824–25 (9th Cir. 1972).

Shafer repeatedly took "action which [was] inimical to the best interests of [her] employer." See Huong Que, 150 Cal. App. 4th at 414. Even without the benefit of the spoliated evidence—which the Court must assume further supports a breach of the duty of loyalty—this element is met.

### 2. Damage Caused by Breach

Skyline has also established that Shafer's breach caused it damage. An employer is damaged by paying wages to an unfaithful employee. See J.C. Peacock, Inc. v. Hako, 196 Cal. App. 2d 353, 359 (1961) ("an employee's disloyalty will work a forfeiture of his right to recover the stipulated compensation"); ChromaDex, Inc. v. Elysium Health, Inc., No. SACV 16-2277-CJC (DFMx), 2020 WL 1279236, at *18 (C.D. Cal. Jan. 16, 2020) (quoting J.C. Peacock, 196 Cal. App. 2d at 358) ("[A]n employee who violates the[] fundamental duties of loyalty cannot recover even for the services he has rendered.").

Skyline has met each of the elements and established that Shafer violated the duty of loyalty. Accordingly, the Court GRANTS the motion as to the breach of the duty of loyalty claim.

### C. Damages

Skyline moves for summary judgment on damages, and Shafer challenges Skyline's damages expert. The Court will not award damages at this time.

#### 1. Skyline Proposed Damages

For a breach of contract claim, a party is entitled to "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course

of things, would be likely to result therefrom." Cal. Civ. Code § 3330.  For a tort claim, a party is entitled to "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code § 3333.

Skyline thus argues that for its breach of contract claim, it is entitled to all of Shafer's compensation for the periods "when she was not rendering the employment services she promised," see Mot. at 10 (citing Applied Equipment Corp. v. Litton Saudi Arabia, Ltd., 7 Cal. 4th 503, 515 (1994) ("'[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.'") (citing Witkin, Summary of Cal. Law (9th ed. 1987) Contracts § 813 at 732).  Skyline argues that for its tort claim, it is also entitled to the compensation it paid Shafer during her breaches.  See id. at 11 (citing J.C. Peacock, 196 Cal. App. 2d at 359–60 (employee who violates duty of loyalty cannot recover for services rendered); Service Employees Int'l Union, Loc. 250 v. Colcord, 160 Cal. App. 4th 362, 371 (2008) (upholding disgorgement of salary and benefits based on breach of duty of loyalty)).  Skyline reasons that "the amount of compensation paid by Skyline to Shafer is not in dispute," as its expert, Kawamoto, detailed Shafer's wages, commissions, and benefits, and Shafer does not have an expert of her own.  Mot. at 11 (citing Lipanovich Decl. Ex. 3 (Kawamoto Report).  Skyline seeks the $745,061.53 that it contends it paid to Shafer while she was breaching her duties.  Id. at 11–13.

Skyline also seeks an additional $70,000 in damages, representing "the amount that would have been negotiated [on the two Skyline-Xentaurs-Cisco deals] were it not for Shafer's breaches."  Id. at 13–14.

Skyline therefore seeks a total of $815,061.53.

### 2. Problems With Skyline's Proposed Damages

There are a couple of problems with Skyline's request.

First, given the dispute of fact about whether the no-commission deals Shafer negotiated for Skyline were, on the one hand, an example of her disloyalty to Skyline and her allegiance to Xentaurs, or, on the other hand, a product of the Skyline CEO's own directives, Skyline cannot presently recover the $70,000 it seeks in connection with those deals.

Second, and most significantly, while the amount of Shafer's compensation throughout her employment at Skyline is no mystery, it is less certain when Shafer was acting disloyally toward Skyline. Skyline breezes over this point, arguing that "The time periods for which Shafer breached her duty of loyalty and fiduciary duty[11] are also clear from the evidence." Mot. at 11. The Court disagrees, for now. Kawamoto's analysis of damages is based on the compensation Skyline paid Shafer during "three time periods that correspond to different breaches by Shafer related to Wonders, Onisick, and Xentaurs." Id. Skyline groups them into two periods. Id. They are (1) the First Time Period: June 2016 to November 2016 and February 2017 to February 2018; and (2) the Second Time Period: March 2018 to September 18, 2018. Id. at 11–13.

### a.   First Time Period: 6/16 to 11/16 and 2/17 to 2/18

The First Time Period represents when Shafer was sharing Skyline's confidential information with Wonders (a Cisco employee); it mirrors Wonders' testimony that he and Shafer were in a romantic relationship from mid-2016 through the end of 2016, and then again from early 2017 through early 2018. Id. at 11–12 (citing Lipanovich Decl. Ex. 14 (Wonders Depo.) at 47:24–49:24; Lipanovich Decl. Ex. 3 (Kawamoto Report) at 2–3.

Kawamoto lists a variety of documents that he relied on in concluding that "During their relationship, Shafer shared internal Skyline communications through email correspondence, including information about Cisco related projects." Lipanovich Decl. Ex. 3 (Kawamoto Report) at 2–3. One problem with this statement is that Kawamoto is a forensic accountant and not, as Shafer points out, a relationship expert. See Opp'n at 20 (collecting Kawamoto deposition testimony about the basis for his opinion that Shafer had relationships with Wonders and Onisick). Kawamoto's opinions about any relationships and their connection to breaches are not the proper subject of his expert report. Skyline essentially concedes this in is reply brief, arguing that "Skyline is not establishing liability through Mr. Kawamoto's testimony" and that he is only "offering a damages opinion." Reply at 12–13. But Skyline cites to Kawamoto's report as support for numerous underlying factual assertions that go beyond damages. See, e.g., Mot. at 3–4

---

[11] It is not clear why Skyline mentions Shafer's fiduciary duty; Skyline has not moved for summary judgment on that claim.

(re Skyline-Xentaurs-Cisco deals); 4 (re Shafer's work for Xentaurs); 9, 12 (re Shafer breaches and disclosures related to Wonders); 12 (re Onisick relationship and breaches). It is especially problematic to cite to Kawamoto for these points as Kawamoto asserts in his report that he was "asked to assume that Shafer breached her duties to Skyline during these time periods." Lipanovich Decl. Ex. 3 (Kawamoto Report) at 10. So Skyline needs to establish the time periods for the damages calculations by means other than Kawamoto.

In addition, Kawamoto attaches to his report none of the documents he lists in his Report as to the First Time Period. Skyline provided some but not all of them to the Court as part of this motion—see Lipanovich Decl. Ex. 5 (2/19/17 email from Shafer to Wonders); Lipanovich Decl. Ex. 6 (1/3/18 email from Wonders to Shafer); Lipanovich Decl. Ex. 15 (2/26/18 email from Wonders to Shafer)—but they only cover the period of February 19, 2017 to February 26, 2018. Those emails do suggest the exchange of proprietary/confidential information. See id. But it is not obvious that Shafer breached her duty of loyalty for that entire year based on three emails. (The Court recognizes that there was probably more evidence from that time period that Shafer destroyed.) The only evidence of the June 2016 to November 2016 time period is emails not provided to the Court that purportedly support the idea that Shafer and Wonders were in a romantic relationship. Lipanovich Decl. Ex. 3 (Kawamoto Report) at 2 (listing three emails about hotel rooms, travel plans, and missing each other). But evidence of an undisclosed relationship is not enough to assume that Shafer breached her duty of loyalty for that time period.

At best there is evidence for just the February 19, 2017 to February 26, 2018 portion of the First Time Period.

### b. Second Time Period: 3/18 to 9/18/18

The Second Time Period represents the period between March of 2018 and Shafer's termination in September of 2018, when Shafer "shared confidential information with Onisick, another Cisco employee. while the two were engaged in an undisclosed romantic relationship," and between May of 2018 and her termination in September of 2018, while "Shafer was also working for the benefit of Skyline's competitor, Xentaurs." Mot. at 12. Skyline relies on the Kawamoto Report, which again lists various documents in support of this time period but does not

attach any. See id. at 12–13 (citing Lipanovich Decl. Ex. 3 (Kawamoto Report) at 3–4).

The same problems the Court noted with the First Time Period are present here: Kawamoto is not an expert in anything other than forensic accounting, he was "asked to assume that Shafer breached her duties to Skyline during this period," see Lipanovich Decl. Ex. 3 (Kawamoto Report) at 11, and the documents are not as helpful as Skyline asserts.

The only evidence from March 2018 is Onisick emailing Shafer about booking a hotel room for them in advance of a work-related event. See Lipanovich Decl. Ex. 3 (Kawamoto Report) at 3. That email does not demonstrate that Shafer was sharing confidential information at that time. Kawamoto cites to Onisick's 5/3/18 and 8/27/18 emails to Shafer asking her to review Statements of Work not involving Skyline, id. at 4—but Shafer claims that she looked at those to see how she could benefit Skyline, see Shafer Decl. ¶ 13. Kawamoto also points to the zero-mark up deals, Lipanovich Decl. Ex. 3 (Kawamoto Report) at 4, but Shafer says that they were the Skyline CEO's idea, Shafer Decl. ¶ 8. There is therefore no basis to conclude, given the disputes of material fact, that the Second Time Period should cover March of 2018 to August 23, 2018.[12]

Kawamoto also cites to a variety of documents from August 23, 2018 to September 10, 2018 (some provided to the Court elsewhere, some not), including the 8/23/18 email introducing Daugherty to Guevara and the 9/10/18 Shafer email to Guevara sharing details of Skyline's bid. See Lipanovich Decl. Ex. 3 (Kawamoto Report) at 4. Those emails, discussed elsewhere in this order, do demonstrate Shafer's disloyalty to Skyline. But they represent less than a month of her employment.

Given the problems with calculating Skyline's damages at this point, the Court will postpone that undertaking.

### 3. Daubert Challenge

The Court need not reach Shafer's Daubert challenge to the Kawamoto Report, as the Court does not reach the damages issue just yet. Notably, however, Shafer does not really

---

[12] Again, this is not all Skyline's fault—Shafer's spoliation limited the available evidence, and the Court must conclude that the missing evidence would have been unfavorable to Shafer during this Second Time Period.

challenge Kawamoto's ability to calculate how much compensation Skyline paid Shafer during particular periods of time. Kawamoto is a forensic accountant, forensic accountants routinely give this kind of testimony, and Kawamoto did his calculations using information provided by Skyline.[13] Shafer does not have her own expert, and does not actually assert than any of Kawamoto's underlying numbers or calculations are wrong. What Shafer objects to is Kawamoto's opinions and conclusions about internal and confidential information, and about Shafer's romantic relationships. See Opp'n at 18–22. The Court agrees that a forensic accountant has no special abilities to interpret such non-financial matters.

### IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment on the breach of contract and breach of the duty of loyalty claims, and postpones the determination of damages.

The Court hereby SETS a status conference in this case for Thursday, January 20, at 10:00 a.m., at which time the parties can discuss the best path forward for determining damages now that liability has been established. The parties are advised of the following information:

1. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/crb
2. **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.
3. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

IT IS SO ORDERED.

Dated: December 14, 2022

CHARLES R. BREYER
United States District Judge

---

[13] Shafer objects to Kawamoto merely compiling and reporting data given to him by Skyline, see Opp'n at 17–18, but that is what experts do.